UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PETER BARKER-HOMEK,

       Plaintiff,

                                      Case No.

v.

                                      Hon.

ABU DHABI NATIONAL ENERGY
COMPANY PJSC aka TAQA, a
corporation; TAQA NEW WORLD,
INC., a Delaware corporation; CARL
SHELDON, an individual; and DOE
DEFENDANTS 1-50, inclusive,

       Defendants.

---

MILLER BARONDESS, LLP
By:  Louis R. Miller (*admission pending*)
     A. Sasha Frid (*admission pending*)
     James M. Miller (*admission pending*)
1999 Avenue of the Stars, Suite 1000
Los Angeles, CA 90067
310.552.4400
smiller@millerbarondess.com
sfrid@millerbarondess.com
jmiller@millerbarondess.com
Attorneys for Plaintiff

BUTZEL LONG, a professional corporation
By:  Daniel J. Dulworth (P41784)
     Katherine D. Goudie (P62806)
150 West Jefferson Avenue
Suite 100
Detroit, MI 48226
313.225.7000
313.225.7080 fax
dulworth@butzel.com
goudie@butzel.com
Attorneys for Plaintiff

---

**<u>COMPLAINT AND DEMAND FOR JURY TRIAL</u>**

## TABLE OF CONTENTS

INTRODUCTION .......................................................................................................................1

PARTIES..................................................................................................................................6

JURISDICTION AND VENUE ..................................................................................................9

FACTS COMMON TO ALL CAUSES OF ACTION ..................................................................9

    A.  The Plaintiff.................................................................................................................9
    B.  Employment At TAQA ...............................................................................................11
    C.  TAQA's Illegal Conduct ............................................................................................14
    D.  Retaliation .................................................................................................................17
    E.  More Threats And Harassment .................................................................................19
    F.  Abu Dhabi "Justice" .................................................................................................20
    G.  Career Damage .........................................................................................................22

FIRST CAUSE OF ACTION (Breach of Contract - Against TAQA and TAQA New World, Inc.) ....................................................................................................................................22

SECOND CAUSE OF ACTION(Retaliatory Discharge in Violation of Public Policy - Against TAQA and TAQA New World, Inc.) .................................................................................23

THIRD CAUSE OF ACTION (Assault - Against All Defendants) ...........................................24

FOURTH CAUSE OF ACTION (Intentional Infliction of Emotional Distress - Against All Defendants) ...........................................................................................................................25

FIFTH CAUSE OF ACTION (Negligent Infliction of Emotional Distress - Against All Defendants) ...........................................................................................................................25

SIXTH CAUSE OF ACTION (Negligent Supervision - Against TAQA and TAQA New World, Inc.) ....................................................................................................................................26

PRAYER FOR RELIEF...........................................................................................................27

Now Comes Plaintiff Peter Barker-Homek, an individual (hereinafter referred to as "Plaintiff" or "Barker"), though his counsel, and alleges against Abu Dhabi National Energy Company PJSC, also known as TAQA,[1] a corporation, TAQA New World, Inc., a corporation (collectively referred to as "TAQA"), Carl Sheldon, an individual ("Sheldon"), and DOE Defendants 1-50, inclusive and each of them (collectively referred to herein as "Defendants"), as follows:

## INTRODUCTION

1.      This case is about unlawful acts committed against a U.S. national—Plaintiff Peter Barker-Homek ("Barker")—at the hands of executives of Abu Dhabi National Energy Company and its wholly owned and controlled U.S. subsidiary, Defendant TAQA New World, Inc., an energy conglomerate controlled by the ruling family of Abu Dhabi.  Abu Dhabi is one of seven autonomous emirates within the United Arab Emirates ("UAE"); the UAE is a confederacy of these "emirates."  An emirate is owned and controlled by an "emir," otherwise known as the ruling prince.  The emirates are under patriarchal rule with political allegiance defined by loyalty to tribal leaders and the emir.  The emir of Abu Dhabi is Sheikh Khalifa bin Zayed Al Nahyan.  The emir and his family control everything in Abu Dhabi—the courts, police, military and press (the "Ruling Family").  There is no independent parliament or congress or legislature.  There are no elections, no political parties.  There are no checks and balances.  A constitution exists in name only.

2.      Plaintiff Barker was Chief Executive Officer of TAQA and TAQA New World, Inc.  When Barker tried to put a stop to the kickbacks, bribery, accounting fraud and corruption at TAQA, the Defendants fired him.  Instead of abiding by the terms of Barker's employment contract, they summoned him to a meeting and presented him with a so-called "severance

---

[1]      TAQA means "energy" in Arabic.

1

agreement," a one-sided agreement in which Barker purportedly agreed to step down as CEO and forfeit millions of dollars owed to him.  Defendant Carl Sheldon, a New York-licensed attorney, chief attorney for and General Counsel of TAQA, demanded that he sign the "severance agreement" on the spot, comply with its provisions, or be arrested and sent to prison. Worried for his life and the well-being of his family, Barker signed the "severance agreement." Thereafter, he was harassed and lived in fear of a "knock" on the door by the police, received mysterious phone calls and was followed, until finally he and his family escaped to the safety of the United States.

3.      When he became CEO of TAQA, Barker was told and believed that change was possible and that business ethics and transparency could be brought to the Middle East.  A graduate of New York University and with an MBA from the University of Southern California, a pilot in the United States Marine Corps and Gulf War veteran, a State Department official and a business executive, Barker embarked on a career in energy markets and transactions.  He was successful at every step of the way.  At executive level positions at Pacific Enterprises, British Gas and British Petroleum, Barker was responsible for handling billion dollar transnational energy deals.  He led multiple teams of analysts and associates and reported to the heads of the companies.  He excelled at every one of his positions and was praised for his hard work, ingenuity, creativity and leadership.  He was highly regarded with a bright future; was the subject of articles in prestigious financial publications; appeared on television on CNBC and other networks as an energy expert; and spoke at conferences and think-tanks worldwide including the Milken Institute in Los Angeles.

4.      In late-2005, Barker was recruited to run TAQA.  Abu Dhabi controls eight percent of the world's oil.  Flush with cash, the Ruling Family of Abu Dhabi had an eye towards international investments and acquisitions.  It recently had created a number of partially or wholly owned companies to invest its vast wealth.  Barker was the right person for the job for its

most recently formed company—TAQA.  He was experienced in energy mergers, acquisitions, sales and disposals.  He had proven that he was able to execute deals in the most difficult environments due to a broad understanding of the energy industry, financing and capital markets. After interviews and negotiations, which took place in part in the United States, Barker was offered the position as TAQA's CEO.

5.      The Ruling Family formed TAQA to concentrate on energy acquisitions. Seventy-five percent of TAQA's stock is owned by the Ruling Family; twenty-five percent is owned by investors and is publicly-traded on the Abu Dhabi Stock Exchange.  When Barker was offered the CEO position at TAQA, the company was in its infancy.  Barker was tasked with making TAQA a global energy leader and a transparent meritocracy.  He was offered an employment agreement with a salary of $360,000 a year and a bonus of 100% of his salary, plus a living allowance and perks.  Barker went to work making TAQA a major player in the world's energy markets.  He structured and executed acquisitions throughout the world.  TAQA was growing and prospering with Barker at the helm.  As a reward for his accomplishments, he received a substantial raise.  In 2008, he signed a new employment agreement paying him an annual salary of $800,000 and a bonus of three times his salary—a four-fold increase in his compensation.

6.      During his tenure as CEO, Barker spearheaded fourteen major deals throughout the world.  TAQA went from a company with $100 million in revenues to over $23 billion in assets and revenues in excess of $4.5 billion.  Under Barker's leadership, TAQA grew to a workforce of over 2,800 employees and operates facilities in the United States, Canada, the Netherlands, India and Africa.  During his tenure, he never missed and often exceeded earning expectations.

7.     Barker wanted to make Abu Dhabi his home.  With support from TAQA, he bought a home.  TAQA held a note on the property that Barker would repay from his bonuses. Barker married a woman of Iraqi descent named Shayma Majed; they have two children.

8.     As CEO, Barker's leadership motto was good governance, meritocracy, transparency, and responsibility for employees, environment and society.  He encouraged business ethics and did not hesitate to fire employees who were underperforming even if they came from privileged Abu Dhabi roots.  Barker was opposed to bribes, anti-Semitism, Enron-like accounting practices, kickbacks and back-dealing that were common in Abu Dhabi.  TAQA was a public company and had a duty to its shareholders.

9.     He hired, and then refused to fire, Jewish-American interns; he declined to enter into a deal with an Indian computer company that would give kickbacks to TAQA executives (the computer company later admitted to a massive fraud scheme); and refused to bribe officials in Morocco in order to obtain the rights to build a power plant there.  He also called out his fellow executives when they underperformed including General Counsel Carl Sheldon, CFO Doug Fraser, Internal Auditor Vadiraj Chenji and Managing Director Frederic Lesage.  In 2009, he advised his leadership team that bonuses would not be paid if the company did not meet earnings expectations.

10.     Because Barker spoke out against fraudulent and unethical practices, other TAQA executives devised a scheme to get rid of Barker, threatened him so he would not go public, and smeared his name in the community.  On October 16, 2009, without any warning, Barker was summoned to the offices of the Abu Dhabi Water & Electricity Authority ("ADWEA"), the entity that owns the majority of TAQA, to meet with the TAQA Chairman, Hamad al Hurr Al-Suwaidi ("Al-Suwaidi").  Barker had attended many meetings there and did not think this one would be unusual.  Upon arrival, Al-Suwaidi told Barker that he was terminated.  Barker was then presented with a "severance agreement" by Defendant Sheldon, the American attorney, and

4

told to sign the "agreement" immediately.  The terms of the "agreement" required Barker to step down as CEO and forfeit his rights under his employment agreement.

11.     Sheldon threatened that if Barker did not sign the "agreement," he would be arrested and imprisoned.  Because there is no due process in Abu Dhabi, Barker knew he could be arrested without cause and held indefinitely without bail or trial; he could languish in prison for years, be deprived of food, beaten and tortured, or worse.  Barker knew that the people he worked for were at the highest echelons of power in Abu Dhabi and could have the police do whatever they wanted.  Having no real option, and under severe duress, Barker signed the "severance agreement."

12.     After the meeting, Barker went home in shock.  Barker and his wife, pregnant at the time (who with her family had fled Saddam Hussein's tyrannical regime in Iraq), thereafter lived in fear.  The stress was overwhelming, causing Barker's son to be born with a rare eye condition that required surgery while he was an infant.  He will suffer physical and cognitive impairment for the rest of his life.

13.     Sheldon, the attorney who threatened Barker with prison, took over Barker's position.  Barker was not allowed to speak to TAQA personnel.  TAQA's executives launched a smear campaign against Barker.  They put out press releases claiming that Barker engaged in improper management practices and overspending while CEO.  There was no truth to any of this.  They bad-mouthed Barker to recruiters.  They even went so far as to spread rumors that Barker was dying of cancer.  It was all part and parcel of the Defendants' scheme to discredit Barker and destroy his reputation.

14.     Barker reached out to the Ruling Family and TAQA Board member Abdulla Saif Al-Nuami ("Al-Nuami").  When his appeals fell on deaf ears, Barker asked that TAQA pay him what he was owed for the duration of his employment agreement.  TAQA refused.  With each appeal, TAQA turned up the heat on Barker and his family.  Barker received mysterious calls

and unexpected visits by agents of the Abu Dhabi Criminal Investigations Department; he was followed; his actions were monitored.

15.     Barker and his family lived in fear on a daily basis.  On July 15, 2010, Barker and his wife gathered their immediate belongings, took their children, drove to the International Airport and booked the next flight to New York.  They left their furniture, cars, family possessions, photos, valuables, almost all their belongings, behind.  Sheldon, who had threatened Barker with prison, was also at the Airport.  Upon seeing Barker and his family, Sheldon made a phone call.  He kept looking over at Barker during the call as though he was trying to describe what Barker was doing.  Apparently, Sheldon and his cohorts were trying to figure out if Barker and his family were making an escape, or just going on a trip.

16.     While waiting to board, an announcement was made on the Airport's PA that the flight to New York was delayed.  Barker and his wife thought this was the end of the road, but they were eventually allowed to board.  Upon arrival in New York, Barker discovered that his and his family's luggage had been ransacked.  Defendants had delayed the flight to search Barker's belongings.  Because Barker and his family were only bringing a limited amount of luggage, and there were no TAQA related documents inside, the searchers presumably concluded this was not an escape and allowed Barker and his family to board the plane.

17.     TAQA did not think Barker and his family would flee and leave everything behind.  But this was their only choice.  Barker and his family finally made their way to safety in the United States.  Only here can justice be served, and the wrongs he suffered be fairly judged and adjudicated.

## PARTIES

18.     Plaintiff Peter Barker-Homek is a citizen of the United States and resident of California.  At all times relevant, Plaintiff was CEO of TAQA in Abu Dhabi and its U.S. subsidiary, TAQA New World, Inc., in Ann Arbor, Michigan.

19.     Defendant TAQA is a corporation based in Abu Dhabi with offices in North America and in Ann Arbor, Michigan.   TAQA does business by and through various wholly owned and controlled companies; TAQA's subsidiary in the United States, TAQA New World, Inc., operates TAQA's U.S. business in Ann Arbor.

20.     Defendant TAQA is the 100% owner of Defendant TAQA New World, Inc., a Delaware corporation.  In 2007, TAQA purchased a subsidiary of CMS Energy in Michigan to operate its United States offices and formed TAQA New World, Inc. to conduct its operations in the United States.  Barker handled the negotiations for the purchase of the subsidiary of CMS Energy, and he spent substantial time in Michigan in the negotiations.

21.     TAQA and TAQA New World, Inc. share the same officers and directors and have a unity of interest that effectively and practically, for all intents and purposes, makes them one and the same.  TAQA New World, Inc. has no board meetings, shareholder meetings or shareholder votes apart from TAQA.  TAQA controls all the decisions and operations of TAQA New World, Inc.  In addition, TAQA New World, Inc. manages the assets of TAQA in the United States, India, Morocco, Ghana and in the Caribbean.

22.     TAQA opened its office in Ann Arbor in February of 2008, and TAQA put out a press release dated February 13, 2008 quoting Barker as the CEO of both TAQA and TAQA New World, Inc.  Barker was responsible for the decision to expand TAQA's operations into the United States, and travelled frequently to the Ann Arbor office during its construction and after it opened.

23.     Defendant TAQA conducts several of its global business functions out of its Ann Arbor office including: human resources; accounting; tax management; and regulatory affairs. Ann Arbor is also the site for TAQA's power generation group that manages energy operations and maintenance in the United States and abroad.

7

24.     Defendant Sheldon served as TAQA's General Counsel, CEO (after Barker) and is currently the General Manager of TAQA.  Defendant Sheldon is also TAQA New World, Inc.'s Vice President, as set forth in a filing with the Michigan Department of Energy, Labor & Economic Growth Bureau of Commercial Services.  Sheldon travelled to Michigan to work at TAQA's Ann Arbor office.

25.     The Defendants, and each of them, were authorized and empowered by the other Defendants, and each of them, to act, and they did so act, as the agents, principals and/or employees of the other Defendants, and each of them; and all of the things alleged to have been done by them, and each of them, were done in the capacity of and as agents, principals and/or employees of such other Defendants.

26.     At all times alleged herein, TAQA, the parent, exercised complete dominion, control and decision-making authority over its U.S. subsidiary, TAQA New World, Inc.  TAQA is responsible and liable for the acts and conduct of its agents, including Defendant Sheldon. Further, each of the Defendants is, and at all times relevant to this Complaint was, the agent, employer, partner, joint venturer, alter ego, affiliate and/or co-conspirator of the other Defendants and, in doing the things alleged herein, was acting within the course and scope of such positions at the direction of, and/or with the permission, knowledge, consent and/or ratification of, the other Defendants.

27.     Barker further alleges that Defendants Does 1 through 50, inclusive, are individually and/or jointly liable for the wrongs alleged herein.  The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants Does 1 through 50, inclusive, are unknown to Barker at this time.  Accordingly, Barker sues Defendants Does 1 through 50, inclusive, by fictitious names and will amend this Complaint to allege their true names and capacities after they are ascertained.

## JURISDICTION AND VENUE

28.     Subject matter jurisdiction is based on 28 U.S.C. §1332(a)(2).  The amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and the action is between citizens of different states and citizens or subjects of a foreign state.  Barker is a citizen of California; TAQA is a citizen of Abu Dhabi and the UAE, TAQA New World, Inc. is a citizen of Michigan; and Sheldon is a citizen of New York.

29.     TAQA has an office in this district in Ann Arbor.  At all times relevant, Sheldon was the General Counsel of TAQA, and worked at and manages its Michigan operations as TAQA New World, Inc.'s Vice President.  TAQA's website states that Sheldon ran the United States operations of TAQA and TAQA New World, Inc.  As a wholly owned and controlled subsidiary, TAQA New World, Inc. conducts TAQA's business in the United States generally and in Ann Arbor in particular.

30.     Venue is based on 28 U.S.C. § 1391.  TAQA does business in Michigan through its wholly owned and controlled subsidiary, TAQA New World, Inc. and has an office in Ann Arbor, in the Eastern District of Michigan.  As Vice President, Sheldon is an officer of and conducts business in the Michigan office of Defendants TAQA and TAQA New World, Inc.

## FACTS COMMON TO ALL CAUSES OF ACTION

**A.**     **The Plaintiff**

31.     Barker built his career through years of hard work and dedication.  After graduating with honors from New York University, Barker served as an officer in the United States Marine Corps.  In the Marines, Barker served as a pilot flying some of the most sophisticated aircraft in the U.S. military including the AH-64 Apache gunship.  After eight years as a USMC officer, Barker went to work in the private sector, then voluntarily re-enlisted for the first Gulf War.  Following that conflict, Barker worked for the U.S. government at a high-level, top-secret position with the Department of State.

32.     After years of public service, Barker was accepted into the University of Southern California's Marshall School of Business and earned a Masters in Business Administration (MBA) in Finance.   Following business school, Barker embarked on a career in the energy business.   At every post, he excelled, exceeded expectations and rose to the top through hard work, intelligence and professional abilities.   From 1994 to 1998, Barker was with Pacific Enterprises/Sempra Energy/The Gas Co. where he was the Vice President of International Mergers and Acquisitions.   In 1998, he joined British Gas as the Director of International Mergers and Acquisitions.   While at British Gas, Barker closed a $1.1 billion transaction in Europe and managed a $400 million gas pipeline acquisition in South America.

33.     In 2000, Barker accepted an executive position as the Senior Advisor for Mergers and Acquisitions at British Petroleum ("BP").   At BP, Barker led some of the company's biggest mergers, acquisitions and takeovers and worked closely with the senior leaders of the company. He was highly regarded at BP, earning a compensation package worth approximately one million dollars per year.   The last deal Barker handled at BP was for $9 billion.

34.     In late 2005, Barker was approached by a representative of a start-up company founded by the Ruling Family of Abu Dhabi that sought an experienced and qualified leader to grow the business.   The company ended up being TAQA.   Barker was intrigued at the challenge of leading a start-up that was backed by the Ruling Family of Abu Dhabi.

35.     Abu Dhabi, officially the Emirate of Abu Dhabi, is one of seven emirates that constitute the UAE.   It is the largest emirate by area and second-largest by population (after Dubai), accounting for approximately 86% of the total land area of the UAE.   The Ruling Family of Abu Dhabi controls everything—the government, the economy, law enforcement, the military, investments and resources.   Within the last ten years, the Ruling Family has created a number of wholly or partially owned companies to invest its vast wealth from oil.

36.     The Ruling Family implements its energy business through a company called Abu Dhabi Water & Electricity Authority ("ADWEA").  ADWEA is a national organization wholly owned by the Ruling Family.  ADWEA owns the majority interest in the Abu Dhabi National Energy Company—TAQA.  TAQA is the Ruling Family's primary investment vehicle for energy investments and acquisitions around the world.  TAQA was founded in 2005 with the objective of becoming a global leader in the energy sector.  It now has a presence in 11 markets in various energy sections including oil and gas exploration, production and storage, power generation and water desalination.

37.     In Ann Arbor alone, TAQA operates a power plant and also operates and maintains facilities on behalf of other organizations.  TAQA's holdings in Michigan produce over 6,500 gross megawatts worldwide.  TAQA and TAQA New World, Inc. also own significant assets in Montana, North Dakota and Wyoming and manage their North American oil properties from Ann Arbor.

## B.     Employment At TAQA

38.     In late 2005, Barker was contacted by Piedmont, a U.S. recruiting company, about the CEO position at TAQA.  The recruiter believed that Barker's experience in high-level energy transactions would be ideal for this position.  Barker had worked abroad and agreed to pursue further discussions.  Barker was in California during the time he negotiated his contract with TAQA.  At that time, Barker was making approximately one million dollars per year at British Petroleum.

39.     Barker was intrigued at the challenge of building a company from the ground up.  He was also enticed by promises made by key TAQA executives and Board members that he "would be leading TAQA for a long time."  Barker was hired by TAQA to build a major international energy business.  Barker's motto in running TAQA was "transparency, meritocracy, good governance, and responsibility for the environment, employees and society."

11

40.     Barker accepted employment as CEO of TAQA in March 2006.  His contract stated that it would terminate upon Barker's 60th birthday, which was over a decade away. Barker began his tenure at TAQA in April 2006 while still in California.  Under the terms of the 2006 agreement, Barker would earn a base salary of $360,000 per year with an annual bonus of up to $360,000, plus a housing allowance and medical insurance.

41.     Barker was hired to make TAQA a meritocracy with transparent policies and practices that would be acceptable in business and financial markets around the world.  As part of the contract, Barker would bring "good governance" and corporate responsibility to TAQA.  It was a material part of the deal that Barker would run things openly and free of graft and corruption.

42.     Barker excelled at TAQA immediately.  He led several successful acquisitions and transformed the company into an entity with significant investments in the world's energy markets.  He flourished in his position and was awarded his full bonus the first two years of employment.

43.     In April 2008, Barker was rewarded for his efforts with a new contract and a substantial raise.  His base salary was increased to $800,000 per year, plus a bonus of three times the salary ($2.4 million per year).  Barker received praise from board members Al-Suwaidi and Al-Nuami for the work he had done to grow TAQA into a powerful player in the global energy markets.  The new contract, similar to the original one, ended when Barker reached his 60th birthday.

44.     Al-Suwaidi and Al-Nuami encouraged Barker to continue his efforts to make TAQA a meritocracy, free from the fraud and corruption so prevalent in Abu Dhabi and the UAE.  This was an absolutely integral part of the deal.

45.     Bolstered by his raise and the praise from Al-Suwaidi and Al-Nuami, Barker wanted to make Abu Dhabi his home and decided to purchase a residence there.  Executives at

12

TAQA supported the purchase.  They offered to have TAQA carry the note so Barker would not have to seek financing, and told him he could invest his bonuses as equity in the residence.

46.     Barker was awarded the highest bonus he was eligible for during the first two years of the 2008 contract, $2.4 million per year.

47.     Barker met a woman named Shayma Majed, and they started dating.  Majed was employed by TAQA in the Corporate Social Responsibility Department ("CSR").  She did not report to Barker.  TAQA's executives opposed Barker's relationship with Majed.  TAQA's employees criticized Barker for dating Majed because she was Muslim and he was not.

48.     The CSR department where Majed worked was established by Barker to support TAQA's compliance with laws, ethical business practices and environment regulations.  The department developed a set of policies to monitor and ensure TAQA's support of law, ethical standards and international norms, and to take responsibility for the impact of its activities on the environment, consumers, employees and the communities in which TAQA operated.  CSR promoted programs to encourage community growth and development, education and environmental protection.  After Barker was terminated, the CSR department was shut down; and it was deleted from TAQA's website.

49.     Francois Duquette, a TAQA attorney, told Barker that he should end his relationship with Majed.  Someone at TAQA sent an email throughout the company with Majed's face superimposed on a naked body.  In the face of this harassment, Majed left the company (and she married Barker).

50.     When Barker accepted the offer to lead TAQA, it was a start-up company.  Through Barker's hard work and leadership, TAQA grew to a company with over $23 billion in assets.  TAQA achieved numerous awards during Barker's tenure, including recognition by Platts, Transparency International and the United Nations.

51.     Barker surpassed expectations and goals.  He never missed quarterly earning expectations and often exceeded them.  He received consistent praise from the Chairman of TAQA, Al-Suwaidi, for his performance.  Barker ran and closed several major deals while at TAQA and significantly increased TAQA's assets.  He improved working conditions for TAQA's employees and increased wages to make them consistent with living standards.

## C.     TAQA's Illegal Conduct

52.     Barker had a duty of care to the company's shareholders and employees, to protect them and the company from illegal, fraudulent, unethical and improper management practices.  He sought to encourage transparency and operate the company in accordance with legal and ethical standards.  But at every turn, he was frustrated, and his contract was breached; here are some examples (and there are more):

a.     Barker was concerned that there were several multi-billion dollar assets and liabilities on TAQA's balance sheet that were unexplained and that TAQA had no control over.  This made no sense, so he began to ask questions.  After investigating the assets, which consisted of several power plants in the UAE, Barker discovered that although TAQA owned 64% of them, TAQA had no control over these assets.  Barker discovered that ADWEA actually had control over the assets.  Although the assets and liabilities were on TAQA's books, TAQA received little or no economic benefit from them.

Barker also discovered that ADWEA was receiving the cash flow and full residual value from these assets.  This enabled ADWEA to report the income stream from these assets, contrary to accounting rules and regulations, and leverage the income stream to borrow money.   This was an Enron-like accounting scheme to hide ADWEA's substantial liabilities, consisting of billions in debt, on TAQA's books.  Barker was very concerned about this and raised the issue with Al-Suwaidi, Sheldon, Fraser, Lesage and

others.  In response, he was told that the Ruling Family wanted it that way and that he should "keep quiet."  TAQA and ADWEA were committing fraud by misrepresenting their assets and liabilities.  As Barker pressed this matter, he was fired.

b.      Barker, in his role as CEO, started an internship program and recruited college students from Europe and the U.S. including from Stanford, Harvard and the University of Michigan.  Al-Nuami, one of TAQA's Board members, questioned Barker about the hiring of interns who were Jewish.  When Barker responded that they were hired because of their qualifications, Al-Nuami demanded that they be fired, saying TAQA did not want any Jews working there.  Barker refused.  Board members at TAQA were angry over Barker's refusal.

c.      In 2008, around the time of his four-fold salary increase, Barker was told by higher-ups in the Ruling Family to enter into a deal with Satyam Computer Services ("Satyam"), an Indian company specializing in computer services outsourcing.  Barker was told by Vice-Chairman Ahmed Saif Al-Darmaki ("Al-Darmaki"), a TAQA board member, that the Ruling Family had agreed to enter into contracts by which Satyam would provide offshore outsourcing for companies it owned.  Barker was told that this included TAQA and was handed an agreement and told to sign it.  The agreement was grossly one-sided in favor of Satyam.  Barker refused to sign and expressed his reservations to Al-Darmaki and other board members.  Barker then received a call from Dr. Baka, the head of Information Technology at ADWEA, demanding that he sign the agreement with Satyam.

Barker was concerned about all this pressure:  First, he was concerned with the unfair and onerous terms of the agreement.  Second, he did not understand why someone from a separate company, ADWEA, would be dictating TAQA's business decisions.  Third, he had serious concerns about Satyam's Chairman and CEO and its business as a

whole.  Barker refused to sign the agreement with Satyam.  Higher-level officials at TAQA and ADWEA were furious at Barker.[2]

d.      Barker was instructed by TAQA board members to hire members of wealthy connected families in the UAE.  He did so, but when these employees did not perform adequately (some even showing up for work inebriated), Barker fired them.  This caused a major stir among the board members and company executives, including Sheldon, Fraser and Lesage, who became angry and told Barker that was not the way things were done in Abu Dhabi.

e.      Board member Al-Nuami told Barker to have TAQA use a specific car leasing company.  Barker thought that the leases were too expensive, and after investigating, discovered that TAQA was paying five times the market rate.  Al-Nuami used that company because he received kickbacks.  After Barker terminated that company, Al-Nuami and other board members made known their anger with Barker.

f.      In 2008, Barker was asked by Al-Suwaidi to go to Morocco and sell a designated buyer shares in TAQA's new power plant in Morocco.  Barker was concerned that absent competitive bidding, this would not maximize shareholder value.  Barker was also told by Al-Suwaidi that in order for TAQA to conduct operations in Morocco, it would have to give $5 million annually for at least five years in a start-up music festival there.  Barker refused to do either of these things.  His refusal infuriated Al-Suwaidi and others within TAQA.

---

[2]      Barker's concerns about Satyam were legitimate.  In January 2009, shortly after his refusal to sign the agreement, Satyam admitted involvement in a huge fraud reported in the Wall Street Journal.  The company admitted to "falsifying" client accounts and that $1 billion of cash and bank loans the company listed as assets were "non-existent."  Even after Satyam's fraud became public, Al-Darmaki and others remained angry at Barker for refusing to sign the outsourcing agreement; apparently, they didn't care about the fraud but only about their own pockets. January 8, 2009 Wall Street Journal.com Article

16

D.     **Retaliation**

53.     Because Barker rejected these illegal practices, TAQA devised a scheme to oust him and install someone who would "play ball."   Other executives at TAQA especially Defendant Sheldon, as well as CFO Douglas Fraser, Managing Director of TAQA North, Frederick Lesage, outside counsel and advisor to Al-Suwaidi, Francois Duquette, and others sought to eliminate Barker and install Sheldon.   They were threatened by Barker's reforms. They wanted him out, and they wanted Sheldon in; they gave Sheldon a big raise because they believed he would take the money and look the other way.

54.     They also resented Barker because he said that bonuses for executives in 2009 would not be guaranteed, since TAQA was not performing as well due to the challenging global economic conditions.   Being held accountable threatened and angered them.

55.     Defendants and the others knew that terminating Barker would not be enough.   He was well-liked and highly respected.   He had stature and credibility.   They needed leverage over Barker.   So they used the Abu Dhabi corrupt legal system as a part of their campaign to coerce Barker to capitulate to their demands, and then they went about smearing his name.

56.     Without warning, on October 16, 2009, Barker was summoned to a meeting at ADWEA's offices.   Defendant Sheldon, Chairman Al-Suwaidi and outside counsel Francois Duquette were present at this meeting.

57.     When the meeting began, Barker was told by Al-Suwaidi that he was terminated as CEO; he was given no reason.   If Barker was terminated for cause, his employment agreement provided that a specific reason listed in the employment agreement had to be given.   Barker did not commit any act to warrant termination.   Barker was stunned.

58.     TAQA undermined Barker and engaged in fraudulent conduct.   TAQA tried to buy Barker's "cooperation," by quadrupling his salary in 2008, but it did not work.   In the

process, TAQA committed multiple breaches of Barker's employment agreement and prevented him from realizing the benefit of his bargain, *i.e.*, employment until age sixty.

59.     At the October 16 meeting, Defendant Sheldon put a document in front of Barker and demanded that he sign it.  According to the document, Barker would step down as CEO and forfeit his rights under his employment agreement.  The document further provided that Barker cease being a participant in TAQA's benefit plans, that he make no statements to the press or media and that he release all of his claims against TAQA.

60.     Barker asked for a few days to review the document and consult with an attorney. Defendant Sheldon thereupon threatened Barker that if he did not sign the document immediately, he would be thrown in prison.  Sheldon said "take it or leave it" and that "leave it" meant going to prison for a "long time."  Sheldon further threatened "take it or we can leave you destitute."  Barker knew how powerful the rulers at TAQA were.  They controlled everything, including the police.  Barker knew that there was no due process in Abu Dhabi.  Only an accusation is required for an arrest to be made.  There is no right to bail or trial.  A person can be imprisoned for months or even years before any charges are filed.

61.     Judges are appointed by the Ruling Family.  Prisoners are frequently beaten, tortured, and deprived of food and water.  Even the location where the prisoner is held is secret. The commercials running on Western media advertising Abu Dhabi as a Middle East oasis are a mirage.  Nothing has changed; the judicial system is corrupt and brutal—as reported by Human Rights Watch, Amnesty International and the U.S. State Department.

62.     Barker was confused.  He had done nothing wrong and asked why Defendants would threaten him with prison.  Defendant Sheldon responded that TAQA would "call" the loan on Barker's residence and that Barker would then be in default thereon.  Since TAQA held the note, Barker would be thrown into debtor prison.  Debtor prisons still exist in the Middle East.

18

Barker, fearing for his own safety and the safety of his family, had no option and signed the forced "severance agreement" under extreme duress.

63.     Although Barker's name is on the deed of his residence, Defendants have taken control of the property.

64.     Sheldon led the campaign to oust Barker.  Sheldon wanted to position himself to run the company.  Sheldon acted in concert with other executives and board members who were unhappy with Barker's reforms and his refusal to tolerate bribery, fraud, kickbacks, anti-Semitism and back-dealing.

65.     Sheldon is a resident of New York and a member of the State Bar of New York. He violated his ethical duties as an attorney when he assaulted Barker and threatened him with prison if he would not sign the "severance agreement."  Sheldon's gross and outrageous conduct was intentional and maliciously driven by pure greed.

**E.     More Threats And Harassment**

66.     Defendants themselves and through their agents, employees and representatives continued to threaten Barker with prison after October 2009.  Barker and his family received surprise visits and mysterious calls from individuals who were suddenly interested in Barker's actions.  Barker and his family lived in constant fear.

67.     Following his ouster, Barker was called and visited by Ahmed Al-Suwaidi on behalf of Defendants, who works for Abu Dhabi's Intelligence Agency.  Al-Suwaidi threatened Barker, telling him he "better not pursue any action against TAQA" and that he should "move on."  He also told Barker that "bad things" happen to people who make waves in Abu Dhabi. Ahmed Al-Suwaidi followed Barker and his family and sought to intimidate him.

68.     Barker was also called by Ashan Khan on behalf of Defendants.  Khan is the former Pakistani ambassador to Abu Dhabi and has ties to Defendants.  Khan warned Barker about the serious consequence that can befall someone who runs afoul of Defendants.

19

69.     Since October 2009, Barker also received calls from Abdullah Khunji, who also works for Abu Dhabi's Intelligence Agency.  Khunji made threats directed at Barker if he didn't "move on."  Khunji also followed Barker and his family to New York after they escaped in July of 2010.

70.     Barker received e-mails from Defendant Sheldon that included veiled threats of prison.  Sheldon threatened that Barker better abide by the terms of the coerced "severance agreement," or else.

71.     Defendants issued bogus press releases about Barker's inability to perform as CEO.  They blamed Barker for expanding too quickly.  Sheldon bad-mouthed Barker in the press.  They even went so far as to spread a rumor of a terminal disease to scare other companies away from hiring Barker.

## F.      Abu Dhabi "Justice"

72.     According to the United States Department of State, the Ruling Family of Abu Dhabi controls and restricts civil liberties, including freedom of speech, controls the press (and internet), and exercises strict control over assembly, association and religion.  The judiciary is a tool of the Ruling Family with no independence.  Torture is used.  Abu Dhabi utilizes arbitrary criminal prosecution, imprisonment and torture.

73.     As recently as March 11, 2010, the United States Department of State specifically found the following about Abu Dhabi:

- There is no democracy.

- Patriarchal rule governs with political allegiance defined by loyalty to tribal leaders.

- There are no general elections.

- The ruling families routinely interfere with privacy and restrict civil liberties including freedom of speech, press, use of the internet, association and religion.

- There is torture, and security forces employ flogging as punishment.

- People are arbitrarily held in custody without charge or a hearing.

- Courts are subject to control by political leadership.

- The Directorate of State and the Federal Intelligence Service intervene in judicial affairs.

- The judiciary is composed largely of foreign nationals subject to deportation.

74.     Prison in Abu Dhabi is not like prison in the United States.  Torture and beatings are common.  People are often detained for months at a time on trumped-up charges.  Under Abu Dhabi criminal laws, prosecutors can order detainees to be held for 21 days without charge; courts thereafter grant 30-day renewable extensions for an indefinite period without requiring prosecutors to file charges.  Accused people often go for months or even years without access to legal counsel.  Foreigners, like the Plaintiff, are especially vulnerable.[3]

75.     It is not possible for Barker to get a fair trial in Abu Dhabi.  There is no discovery, no juries, no live testimony.  Barker's chances of a fair trial there are non-existent.

---

[3]     Here is a reported example of the Ruling Family's control of the judiciary in Abu Dhabi: Sheikh Issa bin Zayed al Nahyan, a member of the Ruling Family, was charged with rape, endangering life and causing bodily harm after a video surfaced of him torturing another man for over three hours.  The Sheikh stuffed sand in the man's mouth, beat him with a nailed board, burned his genitals with a cigarette lighter, shocked him with a cattle prod, poured salt in his wounds and drove a car over the man's body.  The tape surfaced in a civil trial in Texas last year.  Charges were later brought against the Sheikh in Abu Dhabi, where the Sheikh was acquitted by the Court there (there are no juries).  The Court found he had "diminished responsibility" for his actions because of the effects of medication he had taken.  The Sheikh claimed he was cheated by the victim in a business deal.  cnn.com article dated January 10, 2010.

76.     Returning to Abu Dhabi would put Barker's life and his family's lives at risk. Barker is a United States citizen.  His rights must be adjudicated here.  Barker's choice of forum should be given deference.

**G.      Career Damage**

77.     Because of the actions of TAQA, Barker is blackballed from meaningful executive employment.  Recruiters who previously have been eager to place Barker are not returning his calls.  Energy companies that have courted Barker are staying away.

78.     Barker is afraid of traveling outside of the U.S.  Abu Dhabi can, and does, manipulate the processes of INTERPOL through bogus warrants that could cause Barker to be detained in Europe and extradited to Abu Dhabi.

79.     Even though he and his family were supposed to have continuing medical coverage, TAQA has denied medical service to Barker's family, including his infant son.  TAQA has refused to pay bills for surgeries that Barker's son had while Barker was still employed by TAQA.  TAQA's actions are abhorrent.

### FIRST CAUSE OF ACTION
### (Breach of Contract - Against TAQA and TAQA New World, Inc.)

80.     Plaintiff realleges each and every foregoing and subsequent allegation contained in the Complaint, and further alleges as follows:

81.     Plaintiff first entered into an agreement with TAQA in 2006, which was replaced by the agreement in issue in this case entered into on or around April 1, 2008 (the "Agreement"). He also was employed as the CEO of TAQA World, Inc.

82.     As CEO, Barker was tasked to make TAQA a transparent meritocracy, free of corruption and fraud.   Plaintiff's initial agreement in 2006 was predicated upon the understanding that Plaintiff would undertake his duties as CEO in conjunction with making TAQA a transparent meritocracy.  He performed well and received an over quadruple raise in 2008.

22

83.     Defendants promised and agreed to make TAQA the place Plaintiff sought.  But they breached their Agreement with Plaintiff and failed and refused to pay Plaintiff the monies owed thereunder.  They undermined Plaintiff, demanded that Plaintiff accept and cover-up massive fraud, and thereby repudiated and breached the Agreement.  Plaintiff is owed salary and bonus in excess of $30 million.

84.     Plaintiff also was forced into signing the "severance agreement" as discussed herein by coercion and was under severe and extreme duress when it was executed.  The "severance agreement" therefore must be set aside, is of no force or effect and is void.

85.     Defendants failed to live up to their obligations under the Agreement and deprived Plaintiff of the benefit of his bargain thereunder; they materially breached the Agreement.

86.     Plaintiff performed all of his obligations under the Agreement.

87.     As a result, Plaintiff has suffered damages in excess of $30 million, or according to proof at trial.

### SECOND CAUSE OF ACTION
**(Retaliatory Discharge in Violation of Public Policy -
Against TAQA and TAQA New World, Inc.)**

88.     Plaintiff realleges each and every foregoing and subsequent allegation contained in the Complaint, and further alleges as follows:

89.     Public policy in Michigan makes it unlawful for any employer to retaliate against or terminate any employee who reports, verbally or in writing, a violation or suspected violation of a law or regulation pursuant to applicable law.

90.     Plaintiff was wrongfully terminated in retaliation for his refusals to violate the law as described in detail above and incorporated herein.

91.     Between 2008 and 2009, Plaintiff complained to the Board of Directors and officers of Defendants about the activities that took place in violation of the law including but not limited to bribery, kickbacks and accounting fraud, as set forth in detail in this complaint.

92.     After Plaintiff objected to this illegal conduct, he was subjected to adverse employment actions, including wrongful termination and refusal to honor the terms of the Agreement under which he is owed in excess of $30 million.  Plaintiff was subjected to such adverse employment actions in retaliation for having opposed practices that were in violation of law.

93.     As a proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer humiliation, anxiety, severe emotional distress, worry, fear, and injury to his reputation, in excess of $50 million, plus exemplary damages of $50 million, or according to proof at trial.

### THIRD CAUSE OF ACTION
### (Assault - Against All Defendants)

94.     Plaintiff realleges each and every foregoing and subsequent allegation contained in the Complaint, and further alleges as follows:

95.     Defendants had a duty to refrain from assaulting Plaintiff.  By the acts alleged herein, including but not limited to Defendant Sheldon's threats to send Plaintiff to prison, Defendants intentionally breached this duty.

96.     As a proximate result of these actions, Plaintiff has suffered severe, serious and persistent injury in the form of severe emotional distress, humiliation, mental pain, fear, anxiety and anguish.  Plaintiff continues to suffer adverse effects on his health because of Defendants' threats.

97.     As a result of the conduct alleged herein, Plaintiff has suffered damages in excess of $50 million, or according to proof at trial.

98.     Defendants engaged in despicable conduct with the intent to injure Plaintiff and subject him to cruel and unjust hardship in conscious disregard of his rights.  Defendants' actions

were willful, wanton, malicious, and oppressive. Plaintiff is entitled to exemplary damages in excess of $50 million, or according to proof at trial.

### FOURTH CAUSE OF ACTION
**(Intentional Infliction of Emotional Distress - Against All Defendants)**

99.     Plaintiff realleges each and every foregoing and subsequent allegation contained in the Complaint, and further alleges as follows:

100.    Defendants and their agents threatened Plaintiff with prison if he would not sign a purported "severance agreement," a document which took away his contractual rights. Defendant Sheldon threatened Plaintiff with prison at the October 16, 2009 meeting, and Defendants thereafter made additional threats.

101.    Defendants' conduct is outrageous, intentional and malicious and caused Plaintiff to suffer severe mental anguish and emotional distress.

102.    As the proximate result of the conduct alleged above, Plaintiff has suffered mental anguish and mental distress in that he has become frightened, nervous, and anxious, fearing for his own well-being and his family's well-being.

103.    As a result of the conduct alleged herein, Plaintiff has suffered damages in excess of $50 million, or according to proof at trial.

104.    Defendants engaged in despicable conduct with the intent to injure Plaintiff and subject him to cruel and unjust hardship in conscious disregard of his rights. Defendants' actions were willful, wanton, malicious, and oppressive. Plaintiff is entitled to exemplary damages in excess of $50 million, or according to proof at trial.

### FIFTH CAUSE OF ACTION
**(Negligent Infliction of Emotional Distress - Against All Defendants)**

105.    Plaintiff realleges each and every foregoing and subsequent allegation contained in the Complaint, and further alleges as follows:

106.    Defendants owed Plaintiff a duty not to threaten Plaintiff with physical harm including the threats to throw Plaintiff in prison.

107.    Defendants failed to exercise reasonable care in foreseeing that the threats of prison and physical harm would cause Plaintiff to suffer emotional distress.

108.    As a result of the conduct alleged herein, Plaintiff has suffered damages in excess of $50 million, or according to proof at trial.

109.    As the proximate result of the conduct alleged above, Plaintiff has suffered mental anguish and mental distress in that he has become frightened, nervous, and anxious, fearing for his own well-being and his family's well-being.

## SIXTH CAUSE OF ACTION
### (Negligent Supervision - Against TAQA and TAQA New World, Inc.)

110.    Plaintiff realleges each and every foregoing and subsequent allegation contained in the Complaint, and further alleges as follows:

111.    Defendants owed Plaintiff a duty not to threaten Plaintiff and his family with physical harm including the threats to throw Plaintiff in prison.

112.    Defendants failed to exercise reasonable care in foreseeing the emotional distress that Plaintiff would suffer as a result of their threats.  Defendants failed to properly supervise their employees and staff, particularly Defendant Sheldon.

113.    As a result of the conduct alleged herein, Plaintiff has suffered damages in excess of $50 million, or according to proof at trial.

114.    As the proximate result of the conduct alleged above, Plaintiff has suffered mental anguish and mental distress in that he has become frightened, nervous, and anxious, fearing for his own well-being and his family's well-being.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays for judgment against Defendants, and each of them, as follows:

**FIRST CAUSE OF ACTION**

1.      For compensatory damages in excess of $30 million, or according to proof at trial;

**SECOND CAUSE OF ACTION**

2.      For compensatory damages in excess of $80 million, or according to proof at trial;

3.      For exemplary damages in excess of $50 million, or according to proof at trial;

**THIRD CAUSE OF ACTION**

4.      For compensatory damages in excess of $50 million, or according to proof at trial;

5.      For exemplary damages in excess of $50 million, or according to proof at trial;

**FOURTH CAUSE OF ACTION**

6.      For compensatory damages in excess of $50 million, or according to proof at trial;

7.      For exemplary damages in excess of $50 million, or according to proof at trial;

**FIFTH CAUSE OF ACTION**

8.      For compensatory damages in excess of $50 million, or according to proof at trial;

**SIXTH CAUSE OF ACTION**

9.      For compensatory damages in excess of $50 million, or according to proof at trial;

**FOR ALL CAUSES OF ACTION**

10.     For interest;

11.     For attorneys' fees;

12.     For costs of suit; and

13.     For such other and further relief as the Court may deem just and proper.[4]

## DEMAND FOR JURY TRIAL

Plaintiff Peter Barker-Homek hereby demands a jury trial pursuant to Rule 38(a) of the

Federal Rules of Civil Procedure.

Respectfully submitted,

s/ Daniel J. Dulworth (P41784)
Daniel J. Dulworth (P41784)
Katherine D. Goudie (P62806)
Butzel Long, a professional corporation
150 West Jefferson Avenue, Suite 100
Detroit, MI 48226
313.225.7000
313.225.7080 fax
dulworth@butzel.com
goudie@butzel.com
Attorneys for Plaintiff


Louis R. Miller (*admission pending*)
A. Sasha Frid (*admission pending*)
James M. Miller (*admission pending*)
MILLER BARONDESS LLP
1999 Avenue of the Stars, Suite 1000
Los Angeles, CA  90067
(310) 552-4400
smiller@millerbarondess.com
sfrid@millerbarondess.com
jmiller@millerbarondess.com

Dated:  August 27, 2010         Attorneys for Plaintiff

1229081

---

[4]     Because of the threats and other illegal conduct herein, Plaintiff is providing this lawsuit to the applicable authorities, including the FBI and the New York Bar Association, to make a record and report of the Defendants' conduct to date.